STARN O'TOOLE MARCUS & FISHER
A Law Corporation

JUDITH PAVEY 2173-0
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Ph: (808) 537-6100
Facsimile: (808) 537-5434
jpavey@starnlaw.com

Attorneys for Plaintiff A.M., a minor,
by and through her parents Nesha Morisette
and James Morisette, as next of friends of A.M.,
and Nesha Morisette and James Morisette,
individually

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| A.M., a minor, by and through her parents NESHA MORISETTE and JAMES MORISETTE, as next friends of A.M. and NESHA MORISETTE and JAMES MORISETTE, individually,<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　Defendant. | CIVIL NO.<br><br>**PLAINTIFFS' ORIGINAL COMPLAINT** |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW A.M., a minor, by and through her parents, Nesha Morisette and James Morisette, as Next Friends, and Nesha Morisette and James Morisette, individually, and file this original complaint against the United States of America and, in support of their causes of action, respectfully show the Court the following:

### I.

### JURISDICTION, PARTIES, AND VENUE

1.1    This is a medical negligence case brought under the Federal Tort Claims Act for severe and permanent injuries arising out of negligent acts and/or omissions of employees, actual and/or apparent agents, servants, or representatives of the United States while acting within the course and scope of their employment, actual and/or apparent agency, servitude or representative capacity, under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs under the laws of the State of Hawaii, where the acts and/or omissions occurred. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1346(b).

1.2    At all times relevant to these matters, the employees, actual and/or apparent agents, servants, representatives, or contractors of the United States were subject to the United States' right to control, including substantial supervision and direct over their day-to-day activities.

1.3    The Plaintiffs, A.M., a minor; Nesha Morisette and James Morisette are individuals residing in Ft. Meade, Anne Arundel County, Maryland.

1.4    The United States of America is a Defendant.

1.5    At all times relevant to the Complaint, the Defendant, the United States of

America, was the employer of health care providers who administered care and treatment to A. M. while she was admitted to Tripler Army Medical Center.

1.6     Defendant, United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on Florence Nakakuni, United States Attorney for the District of Hawaii, and designated agent for service of process at PJKK Federal Building, 300 Ala Moana Boulevard, Room 6100, Honolulu, Hawaii, 96850; by serving a copy of the Summons and Complaint on Attorney General of the United States of America, Eric H. Holder, Jr., by certified mail, return receipt requested, at the U.S. Attorney General's Office, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-00001, to the attention of the Civil Division; and by serving a copy of the Summons and Complaint on Tripler Army Medical Center, at the Center Judge Advocate General Office, Room 2D-227, 1 Jarrett White Road, Tripler AMC, Hawaii 96859-5000.

1.7     Venue is proper in the United States District Court for the District of Hawaii pursuant to 28 U.S.C. §1391(a)(1), (b)(2), (c) and (e) as the United States is a Defendant and because all or part of the cause of action accrued in this District.

**II.**

**LIABILITY OF THE UNITED STATES OF AMERICA**

2.1     This case is commenced and prosecuted against the United States of America pursuant to and in compliance with Title 28 U.S.C. §§2671-2680, commonly referred to as the "Federal Tort Claims Act." Liability of the United States is predicated specifically on Title 28 U.S.C §§1346(b)(1) and 2674 because the personal injuries and resulting damages of which complaint is made, were proximately caused by the negligence, wrongful acts and/or omissions of the employees, actual and/or apparent agents, servants, representatives or contractors of the

United States, at Tripler Army Medical Center, Honolulu, Hawaii, while acting within the scope

of their employment, actual and/or apparent agency, servitude representative and/or, contractor

capacity under circumstances, where the United States, if a private person, would be liable to the

Plaintiffs in the same manner and to the same extent as a private individual under the laws of the

State of Hawaii.

2.2     The United States Army is an agency of the United States of America. The United

States of America, Defendant, through its agency, the United States Army, at all times material

hereto, owned, operated and controlled the health care facility known as Tripler Army Medical

Center, and through its agency, the United States Army staffed the health care facility with actual

and/or apparent agents, servants, employees, representatives and/or contractors.

### III.

### JURISDICTIONAL PREREQUISITES

3.1     On March 16, 2009, while the minor Plaintiff remained hospitalized at Tripler

Army Medical Center, Plaintiffs submitted administrative claim Form 95s to counsel for Tripler

Army Medical Center and to the appropriate claims officer in the Department of the Army, at Ft.

George G. Meade, Maryland alleging injuries occurring on or about January 6, 2009. Sometime

after James Morisette transferred to Ft. George G. Meade, Maryland, Plaintiffs retained counsel.

On October 29, 2010, Plaintiffs, through counsel submitted Amended Form 95s that incorporated

by reference the original claim forms and extended the "notice" period to include all care

rendered from the admission date of November 1, 2008, in order to preserve all potential claims

while the matter was under review. The amended claims were acknowledged by Deborah

Haffey, Attorney Advisor, U.S. Army Claims Service, Office of the Judge Advocate General,

4411 Llewellyn Avenue, Ft. George G. Meade, Maryland on behalf of the agency, on October

4

29, 2010.

3.2    The Attorney Advisor from Ft. Meade immediately communicated an interest in working toward settlement. Thereafter the Parties undertook exchange and review of the medical records from Tripler Army Medical Center, and all of the minor Plaintiff's subsequent treatment records for all care received after leaving Tripler Army Medical Center. A client interview by the attorney advisors and their chosen life care plan expert/proposed Trustee occurred to facilitate a better understanding of the minor's condition and needs. Eventually the Parties began settlement discussions. As of this date, no mutually acceptable settlement has been agreed upon. Further, as of this date, a letter of denial of said claim has not been received, more than six (6) months have passed, and the Plaintiffs do hereby exercise their option of considering that the claim is denied. Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to commencement and prosecution of this litigation.

**IV.**

**BACKGROUND FACTS**

4.1    This is a medical negligence claim in which a flourishing, neurologically intact, seventy-four (74) day old infant suffered severe, disabling and permanent brain damage and its sequella because the medical professionals caring for her: 1) ignored obvious signs of distress due to a post-surgical, progressive bowel obstruction; 2) delayed surgical intervention until after A.M.'s abdomen was so distended that she was no longer able to breathe adequately without intubation and ventilator assistance; 3) failed to maintain and protect A.M.'s airway during transfer to the operating table; 4) perforated her esophagus in one of the multiple attempts to re-intubate A.M. during a prolonged fifty (50) minute resuscitation; and 5) failed to properly resuscitate A.M. before she suffered a devastating anoxic brain injury.

4.2     On October 25, 2008, Nesha Morisette gave birth to A.M., at U.S. Naval Hospital Okinawa, Japan.

4.3     A.M. was born pre-maturely at 27 weeks and 4 days gestation, weighing one and a half pounds, following a course of labor and spontaneous vaginal delivery. She was intubated for her first four (4) hours of life, and then was able to breathe on her own.

4.4     Trophic feedings (minute volumes of enteral feedings administered to help stimulate the gastrointestinal tract of a pre-term infant) were initiated.

4.5     On or about October 29, 2008, A.M., in response to episodes of respiratory distress, a chest x-ray revealed possible free intraperitoneal air. The medical team suspected a possible bowel perforation. Antibiotic therapy was initiated and arrangements were made to transfer A.M. to Tripler Army Medical Center in Hawaii for surgical care.

4.6     On or about November 1, 2008, A.M. was admitted to Tripler Army Medical Center (herein after referred to as "TAMC").

4.7     On or about November 2, 2008, A.M. underwent a surgical exploration which revealed that she had a small bowel perforation. The surgical team including, but not limited to Dr. Mary J. Edwards, repaired the bowel and created an colostomy in order to allow normal small bowel function to resume, while giving the distal bowel an opportunity to heal. No complications were noted during the surgery. A.M.'s post-operative course was unremarkable.

4.8     On or about December 10, 2008, A.M. underwent surgery to reverse the colostomy, and a re-anastomosis of her intestines in order to for her to resume normal bowel functions. No complications were noted during the surgery. A.M.'s immediate post-operative course was unremarkable.

4.9     Over the next couple of weeks feedings were resumed, A.M. was thriving, and by

all appearances was neurologically intact and progressing normally.

4.10    By about December 22, 2008, A.M. was not tolerating the feedings. An upper gastrointestinal series was performed with contrast material and read as showing no bowel obstruction. No exploratory surgery was planned. Enteral feedings were continued and increased.

4.11    Over the next couple of weeks A.M. continued to show intolerance to feedings, had mild intermittent episodes of respiratory distress, and abdominal distension. Only small amounts of fecal material were passed.

4.12    On or about January 4, 2009, Dr. Joseph Hudak, III, assessed A.M. and noted that her abdominal girth had increased from 30.5cm to 32 cm, and she was having small amounts of emesis. He also noted pitting edema of her abdomen. He ordered her feedings to be increased to 12 ml per hour. He did not order surgical intervention.

4.13    On or about January 5, 2009, at 0813, Dr. Edwards assessed A.M. and noted that her abdominal girth was 32cm with edema, she was irritable when touched, her bowels sounds were high pitched, her urine output had decreased, and her respirations had increased from 50 to 80 per minute. An x-ray revealed several dilated loops of small bowel concerning for "persistent high grade partial obstruction". She was diagnosed with mild ileus. Blood gases showed no acidosis. Feedings were decreased to 4ml per hour. Dr. Edwards noted "if high grade obstruction will consider exploratory surgery in the next 24-48 hours".

4.14    On January 5, 2009, by about 2346, A.M. had experienced two severe apneic episodes. Dr. Sherrreen Batts evaluated A.M., noting that she appeared depressed and ashen, however, blood gases were drawn and confirmed no acidosis resulting from the apneic episodes. Dr. Batts noted as follows: "NPO for intestinal obstruction. Had Upper G.I., contrast not going through small bowel. Lung volume small. Small bowel distended. Blood cultures drawn, placed

on triple antibiotics. Discussed with Dr. Lentz-Kapua. If another episode, will intubate."

4.15    On January 6, 2009, at about 0203, A.M. had a third large apneic episode. Dr. Batts arrived on the unit to find A.M. sleepy and floppy. Again blood gases were drawn and reported as normal, showing no acidosis. Dr. Batts determined that A.M. required ventilator assistance for adequate respiration. Intubation was unsuccessfully attempted by a medical Resident and ultimately accomplished by Dr. Batts.

4.16    On January 6, 2009, at about 0816 Dr. Edwards evaluated A.M. and diagnosed her as having a complete bowel obstruction that required surgery that day.

4.17    On January 6, 2009, shortly before 1100 A.M. was transferred to the operating room for exploratory surgery to address/relieve the bowel obstruction. At some point after A.M. had been moved onto the operating table, it was discovered that the endotracheal tube had been dislodged, and A.M. was cyanotic and not breathing. A full "code" was initiated. Ms. Morisette was brought to the bedside, and witnessed approximately thirty (30) minutes of the "code."

4.18    During the code, multiple attempts to re-intubate A.M. were made by Dr. Hudak, one of which perforated her esophagus. Bilateral pneumothoracies developed due to large amounts of subcutaneous air in her neck and chest for which chest tubes were inserted. Resuscitation efforts including assisted ventilation, chest compressions, and administration of medications continued for about fifty (50) minutes before A.M. was successfully revived.

4.19    Following the code, seizure activity was apparent and A.M.'s blood gases reflected severe acidosis. Head and brain imaging studies showed severe damage to A.M.'s deep central gray matter, consistent with hypoxic-ischemic brain injury. Additionally A.M. had abnormal EEG studies of the brain, and evidence of injuries to other organs, including her kidneys and liver, all signs of severe, prolonged oxygen deprivation.

4.20   On or about January 14, 2009, the exploratory laparotomy that had been postponed due to the "code," was finally performed to address/relieve the bowel obstruction. The operative report notes an obvious mechanical obstruction at the site of the re-anastomosis surgery that had been performed on December 10th and suspicion that the stenosis that caused the obstruction was related to a contained leak at that same site. The bowel contents including contrast from the upper G.I. study and nutritional feeding material were suctioned out, and the bowel repaired.

4.21   The injuries to A.M.'s brain are severe, disabling, disfiguring and permanent. A.M. has been diagnosed with Cerebral Palsy and suffers from the sequellae of her devastating brain injury, including but not limited to impaired motor function, delayed cognitive abilities, and cortical blindness. She has in the past and will, for the entirety of her life require medical care, medical and assistive devices, therapies, adaptive housing and transportation, special educational assistance, attendant care and complete assistance with all of her activities of daily living. Additionally A.M. has in the past and will continue throughout her lifetime to suffer physical pain and suffering, and mental and emotional pain, suffering and anguish and loss of her enjoyment of life. Further, A.M. is and will always be permanently disabled and thus has lost her entire earning capacity and a lifetime of wages.

4.22   Nesha Morisette and James Morisette, as a result of the injuries to their child, have in the past and will continue in the future to suffer mental and emotional anguish, and loss of consortium, and will be forced to spend great sums for medical care, adaptive housing, transportation and equipment, therapies, attendant care and assistance with all activities of daily living for A.M.

**V.**

9

## CLAIM FOR NEGLIGENCE OF DEFENDANT

5.1     The Defendant, the United States of America, by and through its agents, apparent agents, employees, servants, representatives, and contractors, owed A.M. the duty to exercise that degree of care and skill which reasonably competent like health care providers would have exercised under the same or similar circumstances.

5.2     The Defendant, the United States of America, by and through its agents, apparent agents, employees, servants, representatives, and contractors, undertook that duty to provide proper medical care and treatment to A.M., with the level of care, skill, and treatment that is recognized as acceptable and appropriate by reasonably prudent health care providers under the same or similar circumstances.

5.3     The Defendant, the United States of America, by and through its agents, apparent agents, employees, servants, representatives, and contractors, while acting at all times relevant within the scope of their actual and/or apparent agency, employment, service representative and/or contractor capacity, failed to act as reasonably competent like Defendants would have acted under the same or similar circumstances, breached their duty to A.M.,   violated the applicable standards of care, and were negligent by engaging in at least the following acts or omissions, which deviated from and fell below the accepted standards of medical care and treatment in at least the following ways:

      a.      in failing to timely recognize and respond to A.M.'s deteriorating condition caused by the bowel obstruction;

      b.      in continuing to increase the amount of feedings in the presence of a suspected bowel obstruction and despite increasingly obvious intolerance;

      c.      in failing to surgically intervene before A.M.'s abdomen became so

distended that she was no longer able to breathe adequately without intubation and ventilator assistance;

d.      in failing to maintain and protect her airway during transfer to the operating table;

d.      in failing to timely reestablish A.M.'s airway and breathing once the endotracheal tube became dislodged,

e.      in perforating her esophagus while attempting to re-intubate A.M. during the prolonged resuscitation;

f.      in failing to properly resuscitate A.M. throughout the "code";

g.      in failing to adequately train, supervise, and instruct its actual and/or apparent agents, servants, employees, representatives and/or contractors;

h.      in failing to establish and/or enforce and/or follow appropriate policies, procedures, and/or protocols regarding, among other things, management of infants with bowel obstructions, airway management of intubated infants, and infant/pediatric resuscitation;

i.      in failing to establish and/or follow and/or enforce relevant policies, procedures and practices to properly address the needs of patients such A.M.;

j.      in failing to adequately credential, train, supervise, and instruct their actual and/or apparent agents, servants, employees, representatives and/or contractors; and

k.      in other negligent acts and/or omissions in the care of A.M. that may become known throughout the course of discovery.

5.5     Had the Defendant, the United States of America, by and through its agents,

apparent agents, employees, servants, representatives, and contractors, caring for A.M. complied

with the applicable standards of care, A.M. would have been timely and properly treated at a

time before she suffered a devastating anoxic brain injury.

VI.

**PLAINTIFFS' DAMAGES**

6.1     As a direct and proximate result of the Defendant's acts and/or omissions, by and

through its agents, apparent agents, employees, servants, representatives, and contractors, caring

for A.M., while acting at all times relevant within the scope of their actual and/or apparent

agency, employment, service representative and/or contractor capacity, as set forth above, and

due to no fault of the Plaintiffs, A.M. has sustained permanent brain damage with significant

physical, mental emotional, social and economic limitations and effects. These limitations and

effects have in the past and will continue for the rest of her life. The damages sustained by A.M.

include, but are not limited to the following:

a.     physical pain and mental anguish sustained in the past and that in a
reasonable probability will be sustained in the future;

b.     disfigurement sustained in the past and that in a reasonable probability
will be sustained in the future;

c.     physical impairment sustained in the past and that in a reasonable
probability will be sustained in the future;

d.     mental impairment sustained in the past and that in a reasonable
probability will be sustained in the future;

e.     loss of earning capacity that in a reasonable probability will be sustained

in the future after A.M. reaches the age of 18 years;

f.     medical, nursing, therapy, attendant care, assistance with activities of daily living and rehabilitative expenses that in a reasonable probability will be sustained in the future after A.M. reaches the age of 18 years;

g.     special educational expenses that in a reasonable probability will be sustained in the future after A.M. reaches the age of 18 years;

h.     special adaptive living expenses including housing, transportation, and medical and therapeutic devices/products that in a reasonable probability will be sustained in the future after A.M. reaches the age of 18 years; and

i.     loss of consortium with her parents, Nesha Morisette and James Morisette.

6.2     As a direct and proximate result of the Defendant's acts and/or omissions, by and through its agents, apparent agents, employees, servants, representatives, and contractors, caring for A.M., while acting at all times relevant within the scope of their actual and/or apparent agency, employment, service representative and/or contractor capacity, as set forth above, and due to no fault of the Plaintiffs, Nesha Morisette and James Morisette seek to recover for the economic damages incurred on A.M.'s behalf until A.M. reaches majority. Those damages include, but are not limited to:

a.     medical, nursing, therapy, attendant care, assistance with activities of daily living and rehabilitative expenses sustained in the past and that in a reasonable probability will be sustained in the future until A.M. reaches the age of 18 years;

b.     special educational expenses for A.M. sustained in the past and that in a

reasonable probability will be sustained in the future until A.M. reaches the age of 18 years;

c.      special adaptive living expenses including housing, transportation, and medical and therapeutic devices/products sustained in the past and that in a reasonable probability will be sustained in the future until A.M. reaches the age of 18 years;

d.      the reasonable value of attendant care provided by Nesha Morisette to A.M. to the date of trial;

e.      the reasonable value of attendant care provided by James Morisette to A.M. to the date of trial;

f.      loss of household services of A.M.; and

g.      out of pocket expenses.

## VII.

### **PRAYER FOR RELIEF**

7.1      WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that this case proceed to trial, and that Plaintiffs recover a judgment of and from the Defendant for actual damages in the amount of such an amount as the evidence may show and the trier of fact may determine to be proper, post-judgment interest, costs, and all other further relief to which Plaintiffs may show themselves to be justly entitled.

DATED:   Honolulu, Hawaii, January 2, 2015.

STARN O'TOOLE MARCUS & FISHER

Judith Pavey
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Ph: (808) 537-6100
Facsimile: (808) 537-5434
jpavey@starnlaw.com

and

JANET, JENNER & SUGGS, LLC
Dov Apfel (*pro hac applied for*)
Sharon Morgan (*pro hac applied for*)
Seth Cardeli (*pro hac applied for*)
Commerce Center East
1777 Reisterstown Road, Suite 165
Baltimore, Maryland 21208
Ph:  (410) 653-3200
Facsimile:  (410) 653-9030

*Attorneys for Plaintiffs*